**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC G. HAFNER | Civil Action No. 19-790 (MAS)<br><br>**MEMORANDUM OPINION**<br>**(Under Temporary Seal)** |

**SHIPP, District Judge**

This matter comes before the Court on Defendant Eric G. Hafner's ("Hafner") Motion to Withdraw Guilty Plea. (ECF No. 139.) The United States of America (the "Government") opposed (ECF No. 146), and Hafner replied (ECF No. 148). The Court has carefully reviewed the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1, applicable to criminal matters through Local Criminal Rule 1.1. For the reasons below, the Court denies Hafner's Motion.

I.       **BACKGROUND**

Before turning to the facts relevant to Hafner's plea, the Court begins with a brief history of Hafner's conduct throughout this proceeding.

A.       **Hafner's History of Obstreperous and Manipulative Conduct**

The Court begins with Hafner's well-documented history of disruptive conduct. As detailed in its August 11, 2021 Memorandum Order and again in its May 6, 2022 Memorandum Order, the Court has often observed Hafner engage in obstreperous conduct. During the reading of his indictment (which most defendants waive), the Court watched Hafner grin at its reading of the more salacious charges. (Aug. 11, 2021 Mem. Order 1-2, ECF No. 88.) Then, at a later status

conference, Hafner became belligerent and began profaning and disrespected the Government's attorneys and the Court. (*Id.* at 2.) That belligerence crescendoed at the opening of the first trial in this case. There, after requesting to proceed pro se, Hafner ranted for minutes about a government conspiracy against him and screamed at the Court for a recusal. (*Id.* at 3-4 ("Defendant was so loud and irate during his tirade that attorneys for the Government and court staff heard Defendant in the corridors outside the courtroom. In addition, several jurors in a soundproof room heard yelling and raised voices emanating from the courtroom.").) The U.S. Marshals became so alarmed that, without prompting from the Court, four of them surrounded Hafner and eventually escorted him out of the courtroom. The Court declared a mistrial.

At the request of trial counsel, the Court ordered a competency evaluation for Hafner. Separate psychologists, Dr. Anna Lawler ("Dr. Lawler") and Dr. Heather Ross ("Dr. Ross"), diagnosed Hafner with malingering, a diagnostic term for faking symptoms. In support of that conclusion, Dr. Lawler relied on Hafner's history of "using mental health symptoms in the past to avoid negative consequences" to conclude that Hafner presented with "overacting of psychosis" and "calling attention to the illness." (May 6, 2022 Mem. Order 3, ECF No. 108 (quoting Lawler Rep. 14-15).)[1] Dr. Ross—who along with staff observed Hafner for two months at the Federal Correctional Institution, Butner—performed several tests on Hafner to confirm the malingering diagnosis. (*Id.* at 4 (citing Ross Rep. 1).) Notably, Dr. Ross performed one test that "raised 'significant concerns' that [Hafner's] understanding of and ability to participate in the legal process

---

[1] Dr. Lawler ultimately declared Hafner incompetent to stand trial because she was unable to "adequately assess [Hafner's] factual and rational understanding of legal proceedings and his ability to adequately participate in his defense." (May 6, 2022 Mem. Order 3 (citing Lawler Rep. 15).) The Court thus agreed with Dr. Lawler's recommendation to "transfer[] [Hafner] to a secure federal facility . . . where he can be assessed for competency through both direct psychological and indirect observation for an extended period." (*Id.*)

is likely better than what he portrayed during the evaluation." (*Id.* at 5 (quoting Ross Rep. 14).) Dr. Ross also diagnosed Hafner with "other personality disorder, with narcissistic and antisocial traits." (*Id.* at 6.) According to Dr. Ross, that diagnosis meant that Hafner's "maladaptive personality style will likely continue to characterize his functioning in the foreseeable future." (*Id.* (quoting Ross Rep. 17).)

Taken together, Hafner's obstreperous and manipulative conduct led the Court to deny his request to proceed pro se for his second trial. There, the Court detailed numerous instances of Hafner's disruptive conduct, many of which it has outlined above. (*See* May 17, 2022 *Faretta* Hr'g Tr. 12-15, ECF No. 137.) The Court stressed, for example, that "Hafner has materially obstructed a status conference, a trial, and multiple psychological evaluations" and that he "has attempted to manipulate the psychological evaluations by feigning severe mental illness and deficits in legal knowledge." (*Id.* at 14:24-15:4.) These findings led the Court to conclude that "this is not a situation where disruption is predicted"; "[d]isruption has already occurred." (*Id.* at 15:8-10.)

## B.    Hafner's Unconditional Guilty Plea

On the first day of his second try at a trial, after the Court spent a full day empaneling a jury, Hafner pled unconditionally guilty to three counts of a sprawling, thirty-three count indictment. (*See generally* Indictment, ECF No. 12.) Hafner pled guilty to (1) transmitting threatening communications in interstate or foreign commerce, in violation of 18 U.S.C. § 875(c) (Count Four); (2) transmitting threatening communications in interstate or foreign commerce with intent to extort, in violation of 18 U.S.C. § 875(b) (Count Seventeen); and (3) conveying false information concerning the use of an explosive device, in violation of 18 U.S.C. § 844(e) (Count Twenty-Eight). Those counts pertained to four sets of threatening sprees Hafner allegedly engaged in. The more flavorful threats involved killing police officers and judges, planting bombs in law

firms and courthouses, and selling children into sex slavery after "slicing them up." (Indictment

12.)

Hafner admitted under oath to all these threats and more. At the change-of-plea hearing,

the Government (through Assistant U.S. Attorney Ian Brater) elicited the factual basis for the plea

from Hafner. Spanning thirteen pages of the hearing transcript, Hafner's admissions ranged from

garden-variety death threats to truly disturbing conduct:

> MR. BRATER: . . . Mr. Hafner, on or about July 27, 2016, did you place a telephone call via an internet application to the Bradley Beach Police Department?
>
> THE DEFENDANT: Yes.
>
> MR. BRATER: And during this call, did you state that Terry Browning deserves to get shot?
>
> THE DEFENDANT: Yes.
>
> MR. BRATER: That Terry Browning's minor child will get his head bashed in?
>
> THE DEFENDANT: Yes.
>
> . . . .
>
> MR. BRATER: On or about September 1, 2016, did you place a telephone call via an internet application to the law firm of Shebell & Shebell and speak with Mark Apostolou, Jr.?
>
> THE DEFENDANT: Yes.
>
> MR. BRATER: During this call, did you threaten to kill Mark Apostolou, Jr.?
>
> THE DEFENDANT: Yes.
>
> MR. BRATER: Did you threaten to slice him up and feed him to your dogs?
>
> THE DEFENDANT: Yes.
>
> . . . .

MR. BRATER: On or about September 7, 2016, did you place a telephone call via an internet application to the law firm of Shebell & Shebell?

THE DEFENDANT: Yes.

MR. BRATER: And during that call, did you tell the person who answered the phone that there was a bomb in the building?

THE DEFENDANT: Yes.

. . . .

MR. BRATER: On or about August 26, 2016, did you send another email to Carrie Drazin with the subject line, "Re: Parenting 101"?

THE DEFENDANT: Yes.

MR. BRATER: And in that email, did you threaten to kidnap and harm Lara Drazin and Kyra Drazin unless the Drazin family paid you $350,000?

THE DEFENDANT: Yes.

. . . .

MR. BRATER: On or about August 30, 2016, did you place a telephone call via an internet application to Ronald Drazin's home?

THE DEFENDANT: Yes.

MR. BRATER: And during that call, did you threaten to set fire to Ronald Drazin's residence?

THE DEFENDANT: Yes.

THE COURT: Did you threaten to rape Lara Drazin?

THE DEFENDANT: Yes.

MR. BRATER: Did you threaten to slit Carrie Drazin's throat?

THE DEFENDANT: Yes.

MR. BRATER: And you threatened to do all that if Ronald Drazin failed to meet your demand to pay $350,000?

THE DEFENDANT: Yes.

5

. . . .

MR. BRATER: On or about August 2, 2017, did you send an email to Ronald and Carrie Drazin with the subject line: "Rape Lara, kill Nate, kill Lara"?

THE DEFENDANT: Yes.

MR. BRATER: And in that email, did you threaten to kill the Drazin family because they had not paid you the $350,000 you previously demanded?

THE DEFENDANT: Yes.

. . . .

MR. BRATER: On or about September 3, 2016, did you place a telephone call via an internet application to the Monmouth Park racetrack?

THE DEFENDANT: Yes.

MR. BRATER: During that call, did you tell the person who answered the phone that there was a C-4 bomb planted in the grandstand?

THE DEFENDANT: Yes.

MR. BRATER: And that the bomb was going to explode?

THE DEFENDANT: Yes.

. . . .

MR. BRATER: On or about August 31, 2016, did you place a telephone call via an internet application to the police department in Middletown Township, New Jersey?

THE DEFENDANT: Yes.

MR. BRATER: During that call, did you tell the police that you were John Hayes?

THE DEFENDANT: Yes.

MR. BRATER: Did you tell the police that you had just killed John Hayes's wife?

THE DEFENDANT: Yes.

> MR. BRATER: And did you tell the police that you were holding
> John Hayes's son Alex hostage at gunpoint?
>
> THE DEFENDANT: Yes.

(May 17, 2022 Plea Hr'g Tr. 10:10-19, 11:21-12:5, 14:1-8, 15:7-14, 15:22-16:11, 17:9-16,

19:22-20:6, 21:20-22:7, ECF No. 126.) By the end of the hearing, no doubt remained that Hafner

had pled guilty because he was, in fact, guilty:

> MR. BRATER: Are you pleading guilty to Counts 4, 17, and 28 of
> the indictment because you are, in fact, guilty of those charges?
>
> THE DEFENDANT: Yes.

(*Id.* at 23:4-7.)

Hafner's plea was also counseled. In an affidavit submitted by Hafner's plea counsel, Mark

Catanzaro ("Catanzaro"), Catanzaro details his plea discussions with his client. He reports that on

the first day of trial, "Hafner asked [him] to speak with the government about the possibility of a

plea agreement." (Catanzaro Aff. ¶ 3, ECF No. 146-1.) Catanzaro complied with his client's

request, but the trial-ready Government expressed no interest in a plea deal. (*Id.* ¶ 4.) Hafner then

directed Catanzaro to ask the Government if he could plead guilty to three counts of the Indictment;

that offer piqued the Government's interest but only if Hafner admitted the factual basis of the

remaining thirty counts. (*Id.* ¶ 5.) Hafner agreed to the Government's counter. (*Id.*)

Later that day, the Government sent Hafner and Catanzaro a written plea agreement. (*Id.*

¶ 7.) "During a break in the Court proceedings," Catanzaro reports, "[he] thoroughly reviewed and

discussed the written plea agreement with Mr. Hafner." (*Id.*) At some point during these

discussions, Hafner became concerned with his ability to appeal pretrial rulings from a guilty plea.

(*Id.* ¶¶ 6-7.) Catanzaro advised Hafner that the agreement did not contain an appellate waiver but

that the plea may waive Hafner's right to appeal by operation of law. (*Id.* ¶ 7.) To that end,

Catanzaro avers that he "specifically and strenuously advised Mr. Hafner, multiple times, not to

sign the plea agreement and enter a guilty plea pursuant to the plea agreement if his ability to appeal the Court's rulings on his pretrial motions was an important factor in his decision to plead guilty." (*Id.*) According to Catanzaro, Hafner understood this advice and "still wanted to proceed with the guilty plea." (*Id.*)

At the change-of-plea hearing, Hafner confirmed that Catanzaro had adequately advised him. Hafner answered, for example, that he had "fully discussed" the charges with Catanzaro and that he was "fully satisfied with the representation and advice" provided by Catanzaro. (Plea Hr'g Tr. 4:5-11.) Catanzaro also represented to the Court that "Hafner indicated his understanding of all the questions" on his application for a guilty plea and that he signed the plea "voluntarily." (*Id.* at 9:14-17.) The Court and the parties also acknowledged that the plea agreement did not contain an appellate waiver. (*Id.* at 8:24-9:5.) And the Court confirmed that Hafner's "willingness to plead guilty here today [was] because [he was] indeed guilty." (*Id.* at 4:12-14.)

### C.    Hafner's Motion to Withdraw Guilty Plea

About a month after he pleaded guilty, Hafner informed Catanzaro that he intended to withdraw his guilty plea. (June 24, 2022 Letter from Catanzaro 1, ECF No. 116.) That revelation caused Catanzaro to file correspondence with the Court seeking to withdraw as counsel. (*Id.*) The Court then held a status conference on whether to relieve Catanzaro as counsel. Echoing his later affidavit, Hafner explained that he would not have pled guilty had he known he could not appeal the Court's denial of his motion to proceed pro se. (July 28, 2022 Conf. Tr. 9:19-21, ECF No. 138.) Catanzaro recounted that he informed Hafner, before entering the plea, that he was unsure whether "you get to appeal pretrial decisions irrespective of whether there is not a waiver of appeal." (*Id.* at 7:10-12.) He also reported that

> I specifically said do not plead if you are banking on being able to raise the *Faretta* motion on appeal. I said I don't think that's the law, and I think even if there's not a waiver of appeal, which the plea

agreement did not have in it, that would be a pretrial motion that was
not specifically preserved.

(*Id.* at 7:14-19.) Hafner recalled that the plea agreement "did not contain an appellate waiver" and

that "[he] was not told otherwise as far as that." (*Id.* at 9:22-23.) Ultimately, the Court relieved

Catanzaro and appointed new counsel, Tim Anderson ("Anderson"), for Hafner. (*See id.* at

13:13-14:1; CJA Appointment, ECF No. 129.)[2]

Anderson filed the instant motion along with an affidavit from Hafner. The affidavit

asserted Hafner's innocence based on several theories. It provided that "some person or group had

to have hacked into my devices and perpetrated the alleged crimes, likely because they wanted to

discredit [Hafner's] viable runs for the United States Congress." (Hafner Aff. ¶ 3, ECF No. 139-2.)

As to the Government's telephonic evidence, Hafner's affidavit had the answer: "[T]here is

deepfake voice technology that can imitate a voice very easily . . . , making it appear that [Hafner]

had made the calls." (*Id.*) For good measure, Hafner also asserted a legal defense—that the

"statutes charged contain no reference to extraterritorial application." (*Id.*)

Hafner's affidavit also iterates his confusion over the appellate waiver. He avers that he

"understood that the plea agreement would not prevent [him] from arguing any and all issues on

appeal, including [his] pretrial motions." (*Id.* ¶ 4; *see also id.* ¶ 10 ("Because the plea agreement

did not contain an appellate waiver, I firmly believed that the plea agreement allowed me to appeal

anything related to my case, including decisions on my pretrial motions.").) The affidavit also

alleges that Hafner was "sleep deprived" at the time of his guilty plea and that he was unsatisfied

with Catanzaro's representation. (Hafner Aff. ¶ 6.) It further generally complains about this

---

[2] The Court notes that it denied Anderson's motion to be relieved as Criminal-Justice-Act-appointed counsel. Anderson moved the Court to withdraw as counsel "less than a week" after his appointment. (ECF No. 133.) But the Court ruled that Anderson did not demonstrate cause for withdrawal, notwithstanding Hafner's insults about him. (Aug. 25, 2022 Order 2-3, ECF No. 134.)

Court's ruling on Hafner's motion to proceed pro se, his solitary-confinement conditions, and trauma from observing an inmate suicide. (*Id.* ¶¶ 6-7.)

Hafner's motion to withdraw echoes his affidavit. It asserts, for example, that Hafner "credibly" asserted his innocence during the first trial by screaming that "[t]his is a case of slander, lies, and deceit upon the Court and upon the jury." (Def.'s Mot. 1, 7, ECF No. 139-1.) It then charges Catanzaro with ineffective assistance of counsel: "Mr. Hafner pleaded guilty at the end of a fast-paced, chaotic day in and out of court and holding cells with an extremely compressed timeline not because he *is* guilty, but because he relied on confusing and incomplete counsel from his attorney at the time." (*Id.*; *see also id.* at 9-16.) The motion also contends that the Government faces no prejudice from trying Hafner a third time because "most if not all of the potential Government witnesses are local and likely available." (Def.'s Mot. 16 (citing *United States v. Artabane*, 868 F. Supp. 76, 79 (M.D. Pa. 1994)).)

## II.    **LEGAL STANDARD**

Federal Rule of Criminal Procedure 11(d) permits defendants to withdraw a plea of guilty "after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "[A] criminal defendant has no absolute right to withdraw a guilty plea . . . ." *United States v. Martinez*, 785 F.2d 111, 113 (3d Cir. 1986) (citations omitted). Rather, defendants bear a "substantial" burden of showing a "fair and just" reason for withdrawal. *United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003) (citing, among others, *United States v. Hyde*, 520 U.S. 670, 676-77 (1997)). To that end, "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *Id.* (citation omitted). Nor can defendants withdraw their guilty pleas simply because they feel like it. *United States v. Brown*, 250 F.3d 811, 815 (3d

Cir. 2001) (citing *Martinez*, 785 F.2d at 113). Instead, courts evaluating withdrawal motions consider three factors: "(1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3) whether the government would be prejudiced by the withdrawal." *Jones*, 336 F.3d at 252 (citation omitted).

## III.    <u>DISCUSSION</u>

Hafner asserts that he meets all three factors required to withdraw his guilty plea. The Court concludes otherwise and considers each factor below.

### A.    **Hafner Has Not Credibly Asserted His Innocence.**

Hafner must "meaningfully reassert his innocence." *Id.* The Court does not consider all assertions equally, however. "[B]ald assertions of innocence are insufficient to permit a defendant to withdraw his guilty plea." *United States v. James*, 928 F.3d 247, 255 (3d Cir. 2019) (quoting *Jones*, 336 F.3d at 252). Although Hafner may base his assertions on legal innocence alone, he "must present a *credible* legal claim of legal innocence." *Id.* (citations omitted). And in all events, Hafner's assertions "must be buttressed by facts in the record that support a claimed defense." *Brown*, 250 F.3d at 818 (citation omitted).

Hafner fails to meaningfully assert his innocence. In shotgun fashion, he asserts three factual defenses and two legal ones. Start with the bizarre factual defenses. *First*, borrowing from his screed during the first trial, he implies that a government conspiracy led to the charges against him. (Def.'s Mot. 7-8.) He cites no facts to support this conspiracy nor explains how the conspiracy rendered his guilty plea untrue. *Second*, he asserts—for the first time—that some unnamed individuals "hacked into [his] devices and perpetrated the alleged crimes . . . to discredit [Hafner's] viable runs for the United States Congress." (Hafner Aff. ¶ 3.) But that defense too is bereft of specifics and evidence. Certainly, if Hafner's devices were hacked, trial counsel could have moved

the Court for Criminal-Justice-Act funds for expert analysis of those devices.[3] *Finally*, Hafner asserts that deepfake technology could be responsible for the threatening telephone calls. (*Id.* ¶ 3.) Again, Hafner pinpoints no evidence supporting that claim. And, as mentioned, the Court expects that any deepfake defense would have been fully developed by now because this case proceeded to trial twice.

Hafner's legal defenses are likewise meritless. Hafner asserts that trial counsel could have credibly argued that the statutes he pled guilty under were improperly applied extraterritorially. (*Id.* ¶ 3.) He suggests that "he was not in the United States when these offenses occurred." (Def.'s Mot. 8.) But it doesn't matter where Hafner made the threats from. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad . . . ." *United States v. Elbaz*, 52 F.4th 593, 603 (4th Cir. 2022) (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)). The conduct outlawed by 18 U.S.C. §§ 844(e), 875(b), and 875(c) concerns communications conveyed and transmitted through telephone lines, email messages, and the like.[4] So, Congress envisioned two locations for threatening conduct: where the threat was made *and where the threat was received.*

---

[3] The Court further notes that Hafner's eleventh-hour defense doesn't match up with the timing of his Congressional runs. Hafner ran unsuccessfully in the Republican primary in Hawaii's second Congressional district, which took place on August 13, 2016. He then ran unsuccessfully in the Democratic primary in Oregon's third Congressional district, which took place on May 15, 2018. Almost all the conduct alleged in the Indictment occurred in late August and early September 2016—after Hafner's loss in Hawaii and well before his loss in Oregon. The Court thus struggles to credit Hafner's assertion that any hacking occurred to smear his Congressional campaigns.

[4] The statutory text reflects Congress's insistence on transmission. *E.g.*, 18 U.S.C. § 844(e) (outlawing threats to property with explosives made "through the use of mail, telephone, telegraph, or other instrument of interstate or foreign commerce"); 18 U.S.C. § 875(b) (outlawing "any communication" containing extortive threats to injure others that are "transmit[ted] in interstate or foreign commerce"); 18 U.S.C. § 875(c) (outlawing "any communication" containing threats to injure others "transmit[ted] in interstate or foreign commerce").

*See Elbaz*, 52 F.4th at 604 ("Transmission of a message in furtherance of the scheme occurs in at least two locations: 'where the wire transmission at issue originated' and where it 'was received.'" (citation omitted)); *Threat*, Black's Law Dictionary (11th ed. 2019) ("A *communicated intent* to inflict harm or loss on another or on another's property . . . ." (emphasis added)). Put differently, Congress countenanced a "permissible domestic application" of 18 U.S.C. §§ 844(e), 875(b), and 875(c) when defendants transmitted threats to victims in the United States.

Here, Hafner pled guilty to three counts that all involved domestic victims. Count Four involved a telephone call and death threat to a Monmouth County attorney and a death threat about a Monmouth County judge. (Plea Hr'g Tr. 11:21-12:14.) Count Seventeen involved an email message to two Monmouth County residents that threatened to kill those residents and their children unless the family paid $350,000. (*Id.* at 16:22-17:8.) Count Twenty-Eight involved a bomb threat to the Monmouth Park Racetrack. (*Id.* at 19:22-20:6.) Unquestionably, Hafner pled guilty to communicating with—and transmitting threats to—victims in the United States. His extraterritorial legal defense is therefore not credible.

In his reply brief, Hafner asserts another legal defense: that the Speedy Trial Act warrants dismissal based on the Court's ends-of-justice continuances due to the COVID-19 pandemic. (Def.'s Reply Br. 6-7, ECF No. 148.) Courts will not entertain "arguments raised for the first time in a reply brief." *Barna v. Bd. of Sch. Dirs. of Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017) (citations omitted); *Cobra Enters., LLC v. All Phase Servs., Inc.*, No. 20-4750, 2020 WL 2849892, at *1 (D.N.J. June 1, 2020) ("[T]his Court will not accept arguments offered for the first time in the reply brief, as they were not properly asserted in the opening brief and [the Government] ha[s] not had the opportunity to respond to them." (citation omitted)). Even if the Court considered Hafner's speedy-trial argument, it would reject it. Courts in this district have soundly rejected the

precise type of speedy-trial challenge Hafner now argues. *See, e.g.*, *United States v. Wimbush*, No. 19-134, 2021 WL 1811668, at *5-8 (D.N.J. May 6, 2021) ("The Court disagrees that the delay caused by the COVID-19 pandemic, and the Standing Orders issued in response, have violated [d]efendant's rights under the U.S. Constitution[]."); *United States v. Chu*, No. 19-678, 2021 WL 879905, at *3-5 (D.N.J. Mar. 9, 2021) ("There is simply no basis for the Court to conclude that the Third Extension cannot properly exclude time under the Speedy Trial Act . . . ."). More to the point, this Court has already rejected Hafner's constitutional and statutory speedy-trial arguments. After conducting a thorough analysis under the Speedy Trial Act and *Barker v. Wingo*, 407 U.S. 514 (1972), this Court concluded that Hafner suffered no speedy-trial violation. *United States v. Hafner*, No. 19-790, 2021 WL 1873560, at *3-5 (D.N.J. May 10, 2021). It strains credulity to suggest that Hafner could prevail on a defense that both this Court and this District have consistently rejected.[5]

Because Hafner's defenses are not credible, he has declared nothing more than bald assertions of innocence. He has not met his substantial burden for this factor.

### B.  Hafner Has Not Provided Sufficient Reasons for Withdrawal.

Turning to the second factor, Hafner must show "sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea and reclaim the right to trial." *James*, 928 F.3d at 257 (quoting *Jones*, 336 F.3d at 253). Hafner contends that Catanzaro provided inadequate advice about the Government's plea agreement as to the appellate waiver. (Def.'s Mot. 9-16.) Hafner does not dispute that

---

[5] The Court also notes that the out-of-district case Hafner relies on, *United States v. Olsen*, --- F. Supp. 3d ---, 2022 WL 4493853 (C.D. Cal. Aug. 22, 2022), postdates his second trial and his guilty plea. At the time of Hafner's second trial, the Ninth Circuit had reversed a prior district court disposition in the *Olsen* litigation, largely on the same reasoning of the cases in this District. *See United States v. Olsen*, 21 F.4th 1036, 1044-47 (9th Cir. 2022).

Catanzaro equivocated about whether Hafner waived certain arguments on appeal by operation of law. (Hafner Aff. ¶ 10 ("Mr. Catanzaro had told me just prior to the plea hearing, when discussing the plea agreement, that he was not sure, but thought the plea agreement's lack of including my specific right to appeal pretrial motions *may* prevent me from appealing those issues.").) But, according to Hafner, Catanzaro should have affirmatively informed him that an unconditional guilty plea waived his right to appeal non-jurisdictional pretrial rulings (such as the Court's ruling on Hafner's motion to proceed pro se). (Def.'s Mot. 9-10.) The Court is not convinced that Catanzaro provided constitutionally defective advice or that Catanzaro's advice warrants withdrawal of the guilty plea.

To start, Catanzaro did not provide ineffective assistance of counsel. In the plea context, ineffective assistance occurs when "(1) the defendant shows that his attorney's advice was under all the circumstances unreasonable under prevailing professional norms; and (2) the defendant shows that he suffered 'sufficient prejudice' from his counsel's errors." *Jones*, 336 F.3d at 253-54 (citations omitted). As to the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). In addition, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* As to the second prong, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Heeding these mandates from the Supreme Court, the Court concludes that Catanzaro did not provide unreasonable advice by equivocating on whether Hafner was waiving his right to

appeal pretrial rulings. For one, the Government did not provide Hafner—nor did the Court consent to—a conditional guilty plea, which would have expressly preserved his right to appeal pretrial rulings. *See* Fed. R. Crim. P. 11(a)(2). Conditional guilty pleas cannot waive a defendant's right to appeal the carved-out pretrial rulings because the Government "acquires (no) legitimate expectation of finality in the conviction." *United States v. Moskow*, 588 F.2d 882, 887 (3d Cir. 1978) (quoting *Lefkowitz v. Newsome*, 420 U.S. 283, 289 (1975)).

Moreover, because Hafner pled unconditionally guilty, he waived his right to appeal most pretrial rulings. "It is well established that a criminal defendant's unconditional, knowing and voluntary plea of guilty waives all non-jurisdictional issues." *Washington v. Sobina*, 475 F.3d 162, 165 (3d Cir. 2007) (collecting cases). In other words, regardless of whether the plea agreement contains an appellate waiver, defendants' act of pleading guilty waives the right to challenge pre-plea constitutional defects. That's because "a guilty plea represents a break in the chain of events which has preceded it in the criminal process." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *see also Menna v. New York*, 423 U.S. 61, 62 n.2 (1975) ("A guilty plea . . . renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established."). The Third Circuit has interpreted the waiver of pre-plea constitutional violations broadly. *See United States v. Khattak*, 273 F.3d 557, 561 (3d Cir. 2001) (noting that guilty pleas waive as a matter of law "the right to a jury trial, the right to confront and cross-examine witnesses, and the right against self-incrimination," and can waive the "right[] against double jeopardy and [the] Sixth Amendment right to counsel" (citations omitted)).

What does all this talk of waiver mean? It means that Catanzaro did not provide unreasonable advice. He advised Hafner that "[he] believed that the entry of a guilty plea, without

explicitly reserving the right to appeal pretrial rulings, constitutes a waiver of the defendant's right to appeal those pretrial rulings." (Catanzaro Aff. ¶ 7.) That is correct advice. Under the Supreme Court and Third Circuit precedent cited above, a valid guilty plea waives non-jurisdictional pre-plea defects, even if those defects were constitutional in nature. Catanzaro also wisely equivocated as to Hafner's concern about the appealability of the Court's ruling on the motion to proceed pro se. The Third Circuit has not squarely held that a defendant can waive the right to self-representation by pleading guilty.[6] Thus, Catanzaro told Hafner that he was unsure and advised Hafner "not to sign the plea agreement and enter a guilty plea pursuant to the plea agreement if his ability to appeal the Court's rulings on his pretrial motions was an important factor." (Catanzaro Aff. ¶ 7.) Hafner voluntarily decided to plead guilty anyway. The Court fails to see how any of Catanzaro's advice fell below a professional standard or was in any way constitutionally defective.[7]

The Court also notes that it is careful to view Catanzaro's advice through the lens he faced at the time he advised Hafner of the plea. Alongside that view, the Court does not pay undue

---

[6] As the Government notes, however, four other circuits have. *E.g.*, *United States v. Dewberry*, 936 F.3d 803, 805-07 (8th Cir. 2019) ("[W]e conclude Dewberry waived his right to bring his Sixth Amendment claim unless he can show us on the specific facts of his case that he did not enter the plea knowingly and voluntarily."); *United States v. Moussaoui*, 591 F.3d 263, 279-80 (4th Cir. 2010) ("Moussaoui, having pled guilty, has waived all nonjurisdictional errors leading up to his conviction except those affecting the adequacy of his plea."); *Gomez v. Berge*, 434 F.3d 940, 943 (7th Cir. 2006) ("[B]y pleading no contest to the charges against him, Gomez waived his right to challenge any other alleged constitutional violations that preceded his plea. This includes contesting the trial court's determination that he was not competent to represent himself at trial."); *United States v. Montgomery*, 529 F.2d 1404, 1407 (10th Cir. 1976) ("The voluntary plea of guilty is the independent intervening act which renders ineffectual the prior failure to allow appellant to represent himself at a trial.").

[7] Sure enough, the Court agrees with Catanzaro that the Third Circuit would likely conclude that Hafner's guilty plea waived any challenge on appeal to the Court's ruling on the non-jurisdictional motion to proceed pro se. *Cf. United States v. Porter*, 933 F.3d 226, 228-31 (3d Cir. 2019).

deference to Hafner's after-the-fact attestations of Catanzaro's performance. The Court has good reason to doubt Hafner's veracity. As outlined above, based on the Court's own observations and the observations of trained psychologists, Hafner has a propensity for manipulation and malingering. For example, Dr. Ross found that he very likely feigned deficits in legal knowledge to gain more favorable legal outcomes. And she noted that Hafner's personality disorder would likely continue throughout the criminal proceeding. Considering these findings, the Court affords little weight to Hafner's affidavit and his characterizations of Catanzaro's performance. *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").[8]

For similar reasons, the Court also concludes that Hafner has not shown sufficient prejudice from Catanzaro's allegedly deficient performance. As a matter of law, a guilty plea provides no absolute right to appeal. *Khattak*, 273 F.3d at 561 ("If done knowingly and voluntarily, a statutorily created right to appeal is generally held to be waiveable." (citation omitted)). So, Catanzaro advised his client not to take the plea deal if Hafner had any doubts about his ability to appeal. And yet, Hafner took the deal—evincing strong evidence that he did not want to go to trial. The Court also finds as persuasive evidence that Hafner instructed Catanzaro to seek a plea deal on the first day of trial. (Catanzaro Aff. ¶¶ 3-5.) Indeed, Hafner corroborates that Catanzaro informed him about the strength of the Government's evidence and about his minimal chances of success at trial. (*See* Hafner Aff. ¶ 4.) Hafner simply pinpoints nothing but post-hoc protestations of prejudice.

---

[8] Relatedly, the Court notes that neither party has requested an evidentiary hearing. To be sure, the Court does not find an evidentiary hearing necessary in this case as the affidavits and briefings provide sufficient information for the Court to evaluate the plea withdrawal and Catanzaro's plea advice.

In addition to ineffective assistance, Hafner suggests that his state of mind is itself a sufficient reason to justify withdrawal. Hafner describes his state of mind at the time of his plea hearing as "greatly impacted" by witnessing an inmate suicide, as sleep deprived by lacking his usual sleep medication, and as dejected by losing on his motion to proceed pro se. (Def.'s Mot. 15-16.) The Court disagrees that Hafner's state of mind merits withdrawal. For one, he cites no law showing that an anxious mindset caused by a chaotic day of court proceedings justifies withdrawal. For another, Hafner presented with a neutral demeanor at the *Faretta* hearing (held the same day as the change-of-plea hearing) and engaged the Court in the following colloquy:

> THE COURT: . . . [A]re you under the influence or have you had any alcohol, medication, or any prescription drugs within the last 24 hours?
>
> THE DEFENDANT: No, Judge.
>
> THE COURT: Have you ever studied law?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Can you give me a description of the study of law that you've undertaken?
>
> THE DEFENDANT: A variety of courses, Judge. I have a degree as well.
>
> . . . .
>
> THE COURT: What kind of law classes have you taken?
>
> THE DEFENDANT: Introduction to criminal justice, criminal law, narcotics investigations, intelligence function, organizational integration, narcotics investigation, sex crimes, policing systems.
>
> THE COURT: Okay.
>
> THE DEFENDANT: Those are some of them. I'm probably missing a few, but, yeah, criminology, victimology, judicial function.

(May 17, 2022 *Faretta* Hr'g Tr. 5:6-6:1.) The Court notes as well that Hafner has previously exhibited a detailed knowledge of the law. For example, during the first trial, he cited caselaw and

described his Sixth Amendment right to self-representation. (First Trial Tr. 39:13-20, 40:1-3, 42:24-43:19, ECF No. 91.) Like all defendants, Hafner may have been anxious, sleep deprived, and dejected throughout the plea proceedings, but that mindset alone fails to convince the Court that he did not rationally understand the factual basis of the plea or the legal consequences of it. *See Jamison v. Klem*, 544 F.3d 266, 272 (3d Cir. 2008) ("[C]ourts may not accept a guilty plea without first determining, on the record, that the guilty plea was the result of a knowing, and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." (citing *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969))).[9]

In sum, Hafner has not shown a sufficient reason for withdrawing his plea. Catanzaro's pre-plea advice was neither deficient nor prejudicial. Rather, Catanzaro's advice was correct and expressly advised Hafner to go to trial if he was concerned with his right to appeal. Nor has Hafner shown that his mindset during the plea proceedings rose to the level to render his plea unknowing. The Court discerns no reason to disturb Hafner's plea.

**C.    The Government Would Be Prejudiced by Hafner's Plea Withdrawal.**

Turning to the final factor, the Government would be prejudiced by having to try Hafner a third time. At the onset, the Court notes that it need not address this factor at all. "[T]he Government need not show such prejudice when a defendant has failed to demonstrate that the other factors support a withdrawal of the plea." *Jones*, 336 F.3d at 255 (citing *United States v.*

---

[9] To the extent Hafner argues that his state of mind is relevant to his charge of ineffective assistance, the Court rejects that argument. Hafner does not assert that Catanzaro spent insufficient time explaining the guilty plea to him. Nor does he contest that Catanzaro told him that he may be waiving his appellate rights as a matter of law. (Hafner Aff. ¶ 10.) Moreover, the Court credits Catanzaro's assertion that he "specifically and strenuously advised Mr. Hafner, multiple times, not to sign the plea agreement and enter a guilty plea pursuant to the plea agreement if his ability to appeal the Court's rulings on his pretrial motions was an important factor in his decision to plead guilty." (Catanzaro Aff. ¶ 7.)

*Harris*, 44 F.3d 1206, 1210 (3d Cir. 1995)). Even still, the Government has already expended considerable expense in twice bringing Hafner to trial—one of which Hafner abruptly ended by forcing a mistrial. In addition, Hafner has ended both of his trials at the beginning of each proceeding, after the Government assembled its witnesses and the Court seated the jurors. The Court finds inherent prejudice in convening a third trial.

## IV.   CONCLUSION

The Court concludes that Hafner fails to meet his substantial burden to withdraw his guilty plea. He has not credibly asserted his innocence or put forth plausible reasons for withdrawing his plea. And the Court reasons that there's inherent prejudice in risking a third trial with Hafner, a litigant who has proven to be repeatedly obstreperous and manipulative. An order consistent with this Memorandum Opinion will follow.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE